JAMES HALL, CARL PINCKNEY, MILTON HALL and JOHN JACKSON v. HARRY FRANKLIN STEGER, DAVID TAYLOR, E. A. GALLAGHER, individually and trading as E. A. Gallagher & Sons.

(*March* 7, 1956.)

CAREY, J., sitting.

*William F. Lynch, II,* (of Morris, James, Hitchens and Williams) for plaintiffs.

*William H. Bennethum* (of Morford and Bennethum) for Gallagher.

*Henry A. Wise, Jr.,* for Steger.

*Albert L. Simon* for Taylor.

Superior Court for New Castle County, No. 52, Civil Action, 1954.

CAREY, J.:

The plaintiffs were injured in an automobile accident near Claymont, Delaware, while riding in a car which collided with a truck driven by defendant Steger. There is doubt whether this truck was owned by Steger or by defendant Taylor, but, as this dispute is at present immaterial, reference herein will be made only to Steger. He had hauled a load of steel from Sparrows Point near Baltimore, Maryland, to the Budd Company plant in Philadelphia for the defendant Gallagher, and was returning to Sparrows Point, when the accident occurred. Gallagher held a certificate of public convenience and necessity as a common carrier from the Interstate Commerce Commission. Steger did

not. Gallagher claims that the hauling in this case was done under a "one-way lease", and has moved for summary judgment on the ground that the agreement terminated when the truck was unloaded in Philadelphia and Steger's employment thereupon ceased.

Under the written terms of the contract, Gallagher leased the truck for the period commencing when it was loaded and ending when it was unloaded at the point of destination. The lessor agreed to supply a driver and to pay all operating expenses of the truck. The lessee agreed to affix to the vehicle for the duration of the lease its I.C.C. placard which lessor was required to remove at destination and return to lessee before payment of rental. This rental was apparently based upon the distance travelled in hauling the load.

It appears that Gallagher had trucks of its own for hauling steel, but that there were occasions when additional trucks were needed. This particular truck was only one of several that were hired by Gallagher from time to time as the need developed. This one-way lease agreement was used every time with few exceptions, which occurred when Gallagher happened to have some material or goods in Philadelphia to be delivered in Baltimore. For those exceptional instances, a lease would be executed for the return journey. The trip during which this accident occurred was not one of those exceptions. It further appears that Gallagher had a rule, known to Steger, that no loaded truck of a lessor could leave the premises at Sparrows Point until a one-way lease had first been signed, and the cardboard placard showing its I.C.C. permit number attached to the truck in a conspicuous place.

On this trip Steger stopped at a diner near Philadelphia and called Gallagher's agent by telephone. It is not clear whether this call was made shortly before reaching the Budd plant or soon after leaving there. For present needs it will be assumed that the call was made before. The purpose of the call was to ascertain if Gallagher had another load of steel ready for Steg-

er's truck. He was told, in effect, to come on back, as another load was "waiting for him".

In hauling coil steel by truck, it is necessary to use wooden racks to keep the load from shifting. They were supplied by the owner of the steel, and were usually thrown away after delivery of the cargo. On this trip, after his truck was unloaded, Steger put these racks back in because the Budd Company did not want them left on its property and because Steger thought they could be used another time. They were still on the truck at the time of the accident. Moreover, probably through oversight, Steger failed to remove the cardboard placard, which was still on the truck at the time of the collision.

Gallagher relies principally upon *Costello v. Smith*, 2 *Cir.*, 179 *F.* 2d 715, 16 *A. L. R.* 2d 954, in support of the contention that any negligence of Steger should not be imputed to Gallagher. That opinion involved a lease agreement very much like the one in this case. The Court of Appeals recognized the basic principle that one who can lawfully operate only under a public franchise cannot escape liability by engaging an independent contractor to carry on the activity for him. The Court pointed out, however, that the employment ended with the delivery of the cargo and the agency had then terminated. It further held that no statute or regulation forbade the making of a one-way lease, and that the Commission's regulations could not properly be supplemented by judicial decision so as to regulate the operation of empty trucks after the lease has terminated.

The *Costello* case was decided in 1949. Although this type of agreement is apparently widely used, the I. C. C. still has not seen fit to alter its regulations, so far as appears. The decision was accepted by this Court as a correct statement of the federal law in *Chaney v. Service Trucking Co.* (decided without written opinion by Judge Terry). I see no reason to dissent. Whether or not the use of such leases is detrimental to the public welfare is a matter for the Commission's future determination and regulation. An injured third party may show, in a given

case, that the lease was a subterfuge and that the actual agreement of the contracting parties was something different; *prima facie,* however, the lease is valid and correctly represents their agreement, and the burden of proving otherwise must rest upon the third party.

■ The plaintiffs here seek to distinguish the present circumstances from those of the *Costello* case. They argue that a jury could find that the one-way trip lease was in fact a subterfuge, and that the truck was actually leased to Gallagher on a semi-permanent basis because of three factors: (1) the presence of the placard on the truck when the accident occurred; (2) the fact that the timber racks were being taken back to Sparrows Point; (3) the fact that, for a period of sixteen or seventeen days, this truck had been used exclusively in hauling for Gallagher. Plaintiffs further contend that, even if the one-way lease here was bona fide, the telephone conversation served either to modify its terms so as to convert it into a round-trip lease, or to create a new contract whereby the truck was hired for the journey from Philadelphia back to Sparrows Point.

Taking up this second contention, I find nothing in the telephone conversation justifying an inference that the old contract was modified or that a new one was created. In the first place, both Steger and Gallagher's agent were fully aware of Gallagher's invariable policy concerning leases, and were talking with that policy in mind, yet said nothing to suggest an intent to depart from it. In the second place, there was nothing said which prevented Steger from hauling goods or material from Philadelphia to Baltimore or Sparrows Point or some intermediate place for another lessee if he had so desired. All he agreed to do was to go back for another load. The situation was no different than if he had waited until he got back to his home in Baltimore before calling Gallagher about another trip. The conversation was at most a mutual promise to enter into another lease under the same conditions which had been observed in the past, *i.e.,* commencing with the loading of the cargo and termi-

nating with its delivery. I see nothing in the record to justify any other finding by a jury.

I turn now to the plaintiff's first contention, to wit, that the lease was a sham and that this truck was in fact steadily hired by Gallagher. Two facts relied upon cannot be used to support plaintiff's contention, for both were the acts of Steger alone. *Cf.* 1 *Mechem on Agency,* 2d Ed., 210, 538. Leaving the cardboard placard attached to the tractor after delivery of the cargo was done not only without the knowledge and consent of Gallagher, it was in fact contrary to the lease agreement itself and to the instructions given by Gallagher. Keeping the timber racks (which apparently had little value) on the truck was Steger's own idea, done without any order or request or knowledge of Gallagher; it cannot be correctly said that Gallagher hired Steger to haul them back to Sparrows Point.

As to the number and frequency of prior trips made by this truck for Gallagher, the record is quite clear that all were made on the same one-way basis. Gallagher so arranged its facilities at Sparrows Point that the loaded truck was not permitted to leave until such a lease was executed. This was the invariable rule, as Steger and the other drivers knew. The whole testimony thus strengthens, rather than weakens, a belief in the good faith of the present lease. In other words, it is clear that this particular trip was made under exactly the same arrangement as were all prior trips, save in those rare exceptions when Gallagher had goods to be hauled back from Philadelphia. I am unable to find anything in the prior course of dealing which would justify a jury in finding this lease to have been a subterfuge.

The written agreement is unambiguous, violates no regulation of the I. C. C., and shows on its face that Steger was not Gallagher's agent at the time of the accident. The record fails to disclose the existence of evidence which would warrant a different finding. I am, therefore, of the opinion that this case

is controlled by the *Costello* decision, and that defendant Gallagher's motion for summary judgment must be granted.